# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### TERRE HAUTE DIVISION

RAYMOND STROMINGER, )
)
Plaintiff, )
)
vs. )  Case No. 2:10-cv-00158-LJM-DKL
)
E. BROCK, MATT LEOHR, )
D. BROUGH, J. SNYDER, S. McGAVIL, )
S. KING, D. RANARD, INDIANA )
DEPARTMENT OF CORRECTION, )
)
Defendants. )

**Order Granting Defendants' Motion for Summary Judgment**

In this civil rights action, plaintiff Raymond Strominger, a State prisoner, alleges that his federally secured rights under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the Eighth Amendment have been violated.[1] Strominger contends that the defendants' temporary failure to provide a cell or shower in conformance with handicap accessibility construction guidelines, adopted pursuant to the ADA, entitles him to money damages. The defendants remaining in this action, the Indiana Department of Correction ("DOC") and DOC employees, seek resolution of the claims alleged against them through summary judgment.[2] For the reasons explained below the defendants' motion for summary judgment [dkt. 172] is **granted.**

---

[1] The plaintiff's motion to amend complaint or clarify [dkt. 183] is **granted.** The plaintiff may assert a Rehabilitation Act claim alongside his ADA claims. The defendants are not prejudiced by this ruling because the Rehabilitation Act was referenced (although not developed) in the complaint and "whether suit is filed under the Rehabilitation Act or under the [ADA], the substantive standards for determining liability are the same." *McDonald v. Pennsylvania Dept. of Public Welfare*, 62 F.3d 92, 94 (3d Cir. 1995).

[2] Summary judgment on the Eighth Amendment claim was previously granted in favor of Nurse Kim Gray in the Entry of September 25, 2011. The ADA claim alleged against her was dismissed in the Entry signed on May 8, 2012. Accordingly, all the claims against defendant Kim Gray have been resolved.

## Background

Strominger, is a 46-year-old man. He was sentenced to life in prison without possibility of parole in September 2006 after he pleaded guilty to killing three people. See Abstract of Judgment, *State v. Strominger*, Cause No, 49G05-0604-MR-072852 (Marion Sup. Ct. 2006), Def.'s Ex. Z. Prior to his extradition to Indiana to stand trial on these murder charges, he overdosed on drugs, which resulted in damage to the nerves in his legs. Dep. of Raymond Strominger 5-6, Ex. A. Since 2006, Strominger has been incarcerated at the Wabash Valley Correctional Facility ("Wabash Valley").

Apparently, Strominger was relatively satisfied with his placement at Wabash Valley until a series of events occurred in 2010 which resulted in disciplinary actions and Strominger's placement in more restrictive housing units that did not provide the same accommodations for his disability. It is these allegedly deficient accommodations that are the subject of the present lawsuit. Strominger's complaints, however, have been resolved by the DOC such that there is no request for injunctive relief and only the issue of money damages remains.

## Standard of Review

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. P. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish

the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.; see also Lewis v. Holsum of Ft. Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002).

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). When evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex,* 477 U.S. at 330.

## Statement of Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Strominger as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

Since 2006, Strominger has been housed at Wabash Valley, a maximum security facility which opened in 1992, although all construction was not completed until 1997. At the beginning of August 2008, Strominger was housed in a general population cell, M-307, which is one of the larger corner cells in which offenders with wheelchairs and/or other mobility issues are assigned

when space permits. M-307 has handrails around the water closet, knee clearance underneath the sink, and open areas in front of the water closet and sink. Although two offenders can be housed in each of these cells, there is only one lower bunk, and the upper bunk would not be accessible to an offender with significant mobility difficulties.

*Transfer to Cell M-301*

On August 17, 2008, after the DOC received a report that Strominger threatened casework manager Aleta Burnett, a correctional officer searched Strominger's cell. When the correctional officer asked Strominger to step out of his wheelchair, the officer found a "shank," a sharpened piece of metal, underneath the cushion in Strominger's wheelchair.

On August 18, 2008, Strominger was moved from M-307 to M-301. Both M-307 and M-301 are located on a lower level of M-dormitory. M-301 was a smaller cell. While in M-301 Strominger was able to pass through the cell door while sitting in his wheelchair. He was then able to transfer without assistance to and from his wheelchair, toilet, and bed. See Def.'s Exh. A, Strominger Depo. at 6-7. Strominger was able to transfer by using his hands, "like I transfer everywhere." Strominger Depo. at 26-27. Strominger was able to access the sink while sitting on the toilet. The cell, however, is not large enough to maneuver the wheelchair around the cell. It also lacked a grab bar by the toilet or a wall-mounted sink with knee clearance underneath.

On August 20, 2012, Strominger fell and was injured in M-301. Strominger testified that he woke up in the middle of the night to use the bathroom. He got up, scooted to his chair and was "trying to stand to use the toilet, which I shouldn't have tried, and that's when I lost my balance and fell because there's no handrails in that toilet." Strominger Depo. at 28.



Dkt. 193-16 (picture reflecting floor plan of cell M-301).



Dkt. 193-15 (picture reflecting floor plan of cell M-307).

*Transfer to Custody and Control Unit*

On August 26, 2008, as a result of the weapon found in Strominger's possession and the disciplinary action which followed, Strominger was placed in segregation, which required his transfer from M-301 to the Custody and Control Unit ("CCU"). Stominger does not complain about the cell to which he was assigned in the CCU.

The CCU shower Strominger was assigned did not have a wall-mounted bench seat. Another offender had torn off the wall-mounted bench seat about ten years earlier and it had not been replaced. Upon arrival at the CCU, Strominger was provided a standard plastic chair for his use while taking a shower. Other inmates in wheelchairs had been provided these chairs in the past and Lt. Daniel Brough, who was the CCU zone supervisor, cannot recall anyone complaining about the chairs until Strominger arrived at the CCU. Lt. Brough himself had seen other inmates who were as heavy and large as Strominger using the chairs safely. Strominger states that he refused to use the plastic chair because it did not meet federal regulations. He contends that, "[j]ust by looking at it," he knew that it was unstable and not rated for his size. Strominger Dep. at 44. "I wasn't going to try to transfer to that chair, no." *Id.* Had Strominger requested physical assistance getting into the shower or getting seated, the assistance would have been provided.

On or about September 3, 2008, unit team manager Matt Leohr received a letter from Strominger stating that he was unable to shower because the shower lacked an adequate shower seat. Leohr sent an e-mail to J.D. Horst, who was the facility's safety hazard manager at the time, asking whether the CCU was in compliance with the ADA. He also did some research and identified a PVC-pipe shower chair that he thought might meet Strominger's needs, and he sent Horst another e-mail suggesting that the CCU buy the chair. On or about September 26, 2008, Leohr learned that the facility had purchased a portable shower chair, although not the one that he

had recommended, and the portable chair was sent to the CCU for Strominger's use. See Def. Exh. B (depicting the shower chair that was sent to the CCU).

On September 18, 2008, Strominger wrote to Lt. Brough about his shower concerns. Brough recalls that Strominger was refusing to take a shower because it did not have a wall-mounted bench seat. Soon after his meeting with Strominger, Lt. Brough noticed that a staff shower had the wall-mounted bench seat that Strominger had requested. So Lt. Brough asked the facility's maintenance section to remove that seat and install it in the shower that Strominger was using. The seat was installed on or about October 3, 2008. Strominger did not use the shower between August 30, 2008, and October 3, 2008.

*Transfer to Secure Confinement Unit*

After about a year in the CCU, on October 5, 2009, Strominger was transferred to the Secure Confinement Unit ("SCU"), after he severely beat a 71-year-old inmate, William Clark, in the head with a wheelchair leg rest or footrest, causing injuries that led directly to Clark's death. Upon arrival at the SCU, Strominger discovered that the shower available to him did have grab bars, but did not have a wall mounted shower bench. Strominger did not shower between October 8, 2009, and February 18, 2010. On February 18th a wall mounted shower bench was installed.

On October 9, 2009, Scott McGavic, the facility's fire chief and acting safety manager, received a letter that Strominger had written the day before to J.D. Horst, the former safety manager. In it, Strominger complained that the shower assigned for his use lacked the "required secured handicap seat." Letter from R. Strominger to J.D. Horst, Oct. 8, 2009, Def. Ex. F, dkt. 175-6. As a result of McGavic's investigation, the portable chair that had been purchased for Strominger's use at the CCU but apparently never used, was sent to the SCU on October 9, 2009, for Strominger's use. McGavic investigated to determine if the chair would meet Strominger's

needs. On Oct. 16, 2009, Milburn Pharmacy sent McGavic a facsimile of the medical supplier's specifications for the chair, which noted that the chair had suction-cup feet capable of securing the chair in a bathtub and a weight capacity of 500 pounds.



Def.'s Exh. B (photograph depicting the portable shower chair that was sent to the SCU, and also a true and accurate depiction of the shower that was available for Strominger's use while he was in the SCU). Between October 9, 2009, and February 17, 2010, the shower with grab bars and the portable shower chair was available to Strominger for his use.

McGavic received a second letter from Strominger on October 26, 2011, in which Strominger again complained about the lack of a "secured down seat, like required by the ADA." Def. Exh. H, dkt. 175-8. Upon receiving the letter, McGavic went to Strominger's cell to talk to

him personally, at which time Strominger said the shower seat had to be bolted to the wall and floor. McGavic reported Strominger's concerns to the facility's administration.

Lt. Jerry Snyder, who was the unit team manager of the SCU, also received a letter at some point from Strominger, complaining about not being able to shower because the stall lacked an adequate seat. Upon receiving the letter, Snyder checked with the facility's safety manager, who told him the portable shower chair was adequate to meet Strominger's needs until a wall-mounted shower seat could be installed. Snyder then told Strominger that, in the safety manager's judgment, his needs were being met.

At some point, Lt. Steven King, who was then the zone supervisor of the SCU, became aware that Strominger was still refusing to take a shower, despite the facility's provision of the portable shower chair. On at least two or more occasions between October 6, 2009, through February 20, 2010, King talked to Strominger about taking a shower. He also told Strominger that the chair could support his weight, was appropriate for use in a shower, and would meet Strominger's needs. King had personally observed Strominger standing, and moving about while standing and not in his wheelchair. He had also discussed the adequacy of the chair with the facility's safety manager.

Strominger continued to refuse to shower, and on December 4, he filed a written grievance regarding the lack of a "secured seat." The formal written grievance is the first formal step in DOC's grievance process after informal attempts to resolve the grievance have failed.

Officer Andy Porter, who has since left state employment but who was then the facility's ADA Coordinator, inspected the shower on December 22, 2009. On December 29, 2009, citing the ADA Accessibility Guideline[3] 4.20.3 for bathtubs and 4.21.3 for shower stalls, determined the

---

3 This document sets guidelines for accessibility to places of public accommodation and commercial facilities by individuals with disabilities. These guidelines are to be applied during the design, construction,

grievance to be founded. To resolve Strominger's grievance, he stated that Physical Plant Manager Roger Dagley would be asked to install a shower seat that met the ADA Accessibility Guidelines.

A bench shower seat of the sort required by Guideline 4.21.3 is a specialty item for which it often requires a couple of weeks' time to locate appropriate suppliers and obtain three quotations, in keeping with state procurement rules. Dagley obtained a price quote on December 31, 2009 from Grainger Industrial. On January 4, 2010, he obtained his second and third quotes from Accessibility Professionals, Inc. and Architectural Sales. The lowest bid meeting specifications was from Architectural Sales. He began the process of ordering a seat on January 6, 2010, the very next day, and he ordered five seats so that he could replace other seats that had been damaged or had deteriorated.

When the seats arrived in early February, however, Dagley's staff discovered that a ledge along the base of the shower wall prevented the seats from being mounted at the correct height. Special parts had to be machined to allow the seats to be mounted correctly, but the persons who could do this were engaged in another project. Dagley freed up these persons as soon as he could to make the parts, and on February 17, 2010, the new wall-mounted seat was installed in the shower that Strominger was using. The seat was tested and found stable even after 400 pounds of pressure was exerted on it.

---

and alteration of such buildings and facilities to the extent required by regulations issued by Federal agencies, including the Department of Justice, under the Americans with Disabilities Act of 1990.



Def.'s Exh. D (true and accurate depiction of the wall mounted shower seat after it was installed in the SCU).

## Discussion

Strominger seeks compensatory and punitive damages because the defendants required him to use, for a period of time, a smaller cell and certain shower stalls without a wall mounted bench seat. Strominger contends that the cell and showers provided did not meet certain federal construction standards and therefore the DOC is liable to him for damages under Title II of the ADA, 28 U.S.C. § 12133, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et. seq. He also seeks damages against the individual defendants pursuant to 42 U.S.C. § 1983 for violations of his Eighth Amendment rights.

**A.       The ADA and Rehabiliation Act**

Title II of the ADA and Section 504 of the Rehabilitation Act are similar. Both statutes seek to prohibit discrimination by public entities on the basis of disability.[4] Title II of the ADA proscribes public entities from denying equal services to individuals because of their disabilities. *Discovery House, Inc. v. Concol. City of Indianapolis*, 319 F.3d 277, 279 (7th Cir. 2003). Specifically, Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act states, "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . ." 29 U.S.C. § 794.

There is no dispute that the ADA and Rehabilitation Act claims against the individual defendants must be dismissed because these statutes do not provide a cause of action against individual employees or officials in their individual capacity. *See Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 670 (7th Cir. 2012) (citing 29 U.S.C. § 794(b); 42 U.S.C. § 12131; *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004); *Garcia v. S.U.N.Y. Health Scis. Ctr.*

---

4  There is also a major difference between the ADA and Rehabilitation Act. That is, the Rehabilitation Act includes as an additional element the receipt of federal funds, which all states accept for their prisons. *Jaros*, 684 F.3d at 671-72. The ADA, however, does not require the receipt of federal funds and the courts have struggled with whether Congress's purported abrogation of a State's sovereign immunity is valid when the challenged conduct violates the ADA but not the Constitution. *United States v. Georgia*, 546 U.S. 151, 159 (2006). As practical matter, the Seventh Circuit has found it is sensible to "dispense with the ADA and the thorny question of sovereign immunity" presented by the Supreme Court in *Georgia*, 546 U.S. 151, and to focus on the Rehabiltation Act because the plaintiff may have only one recovery. *Id.* at 672. In this case, both the ADA and Rehabilitation Act fail on the merits and the issue of sovereign immunity is not discussed further.

*of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (collecting authority)). In addition, a claim against the individual defendants in their official capacities is really a claim against the DOC. *See Jaros*, 684 F.3d at fn.2. Because the DOC is also named as a defendant, the ADA and Rehabilitation Act claims against the individual defendants in their official capacities are dismissed as duplicative. Accordingly, the individual defendants (in both their individual and official capacities) are entitled to judgment as a matter of law on the ADA and Rehabilitation Act claims alleged against them. The ADA and Rehabilitation Act claims shall be considered against the DOC only.

Similarly, the relief available to a prisoner under the ADA and Rehabilitation Act are coextensive. *Jaros*, 684 F.3d at 671-72. Strominger seeks both compensatory and punitive damages. Neither statute, however, allows recovery for punitive damages in a private cause of action. *Barnes v. Gorman,* 536 U.S. 181, 189 (2002) ("Because punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act.") Thus, as a matter of law, Strominger is limited to bringing an ADA or Rehabilitation Act claim for compensatory damages only.

To state a claim under the Rehabilitation Act or ADA, Strominger must show that (1) he is a qualified person (2) with a disability and (3) the DOC denied him access to a program or activity because of his disability. See 29 U.S.C. § 794(a); *Wis. Cmty. Serv. v. City of Milwaukee*, 465 F.3d 737, 746 (7th Cir. 2006); *Foley*, 359 F.3d at 928; *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 119 (7th Cir. 1997). In this case, there is no dispute that Strominger is a qualified person with a disability or that refusing to make reasonable accommodations is tantamount to denying access. The Seventh Circuit has held that the showers made available to inmates are a program or activity for which accommodations maybe required. *Jaros,* 684 F.3d at 672. The question then is whether

13

under the ADA and Rehabilitation Act the DOC unlawfully discriminated, excluded or denied services to Strominger. *Foley*, 359 F.3d at 928.

A finding that the ADA or Rehabilitation Act has been violated, however, will not necessarily result in a finding that the public entity is liable for money damages. Compensatory damages are only available if "a public official *intentionally* discriminates because of disability."[5] *Morris v. Kingston*, 368 Fed. Appx. 686, 689-690 (7th Cir. 2010) (emphasis in original) (finding that a 17-day delay in providing simple, low-cost, low-tech, and effective accommodation for hearing impaired prisoner during which time he missed meals and medicine might constitute negligence but not intentional discrimination). It is not enough to simply show that the defendant failed to comply with the relevant regulations. *Meagley v. City of Little Rock,* 639 F.3d 384, 387 (8th Cir. 2011) (finding that although zoo violated the ADA and Rehabilitation Act by maintaining facilities which did not comply with relevant regulations, the injured plaintiff was not entitled to compensatory damages because she had not provided proof of intentional discrimination).

Under the ADA and the Rehabilitation Act, public entities are required to design and construct facilities in such a manner that they are readily accessible to and usable by individuals with disabilities if the construction was commenced after January 26, 1992. 28 C.F.R. § 35.151(a) (effective January 26, 1992). Specifically,

> Design, construction, or alteration of facilities in conformance with the Uniform Federal Accessibility Standards (UFAS) (Appendix A to 41 CFR Part 101-19.6) or with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG) (Appendix A to the Department of Justice's final rule implementing title III of the ADA, _____ F.R. _____) shall be deemed to comply with the requirements of this section with respect to those facilities, except that the

---

[5] Strominger's ability to recover compensatory damages for emotional injuries is also limited by the Prisoner Litigation Reform Act ("PLRA") which provides "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. ' 1997e(e). Thus, Strominger must show a physical injury if he is to recover any compensatory damages for emotional injuries.

elevator exemption contained at §4.1.3(5) and §4.1.6(1)(j) of ADAAG shall not apply. Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided.

28 C.F.R. §35.151 (effective January 26, 1992); *see also, Juvelis v. Snider*, 68 F.3d 648, 653 (3d Cir. 1995) (§ 504 of the Rehabilitation Act "requires some affirmative steps to accommodate handicapped persons"). In other words, compliance with the Uniform Federal Accessibility Standards or with the Americans with Disabilities Act Accessibility Guidelines is sufficient to show compliance with the ADA and Rehabilitation Act. However, a facility may depart from particular requirements of either standard when equivalent access is provided. To be "reasonable" the accommodation or modification must give disabled prisoners "meaningful access" to the service, program, or activity in question. *Alexander v. Choate*, 469 U.S. 287, 301 (1985); 29 U.S.C. § 794; 28 C.F.R. § 35.130(b)(7). "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation." *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1197–98 (10th Cir. 2007).

The DOC argues that it is entitled to summary judgment because there is no evidence that it intentionally discriminated against Strominger because of his disability. In response, Strominger argues that the DOC failed to comply with certain regulations in violation of the ADA and Rehabilitation Act. See dkt. 193-24.

## B.    Eighth Amendment

Strominger seeks damages against the individual defendants pursuant to 42 U.S.C. § 1983 for violations of his Eighth Amendment rights. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). However, not all injuries or

deprivations suffered by an inmate rise to the level of an Eight Amendment violation. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish an Eighth Amendment claim, a prisoner must satisfy both objective and subjective components. To satisfy the objective component the prisoner must establish that the deprivation alleged was sufficiently serious such that "'a prison official's act or omission results in the denial of the minimal civilized measures of life's necessities.'" *Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer,* 511 U.S. at 834). "For instance, extreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992) (internal citations and quotations omitted). "Adequate food and facilities to wash and use the toilet are among the 'minimal civilized measure of life's necessities,'" that must be afforded prisoners. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Jaros,* 684 F.3d at 670. The subjective component requires the prison official to have a sufficiently culpable state of mind. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health. . . ." *See Farmer,* 511 U.S. at 837.

As a preliminary matter, there is no dispute that Strominger's Eighth Amendment claim against the DOC is barred because the DOC, as an arm of the State of Indiana, is not considered a "person" within the meaning of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983"); *Greenawalt v. Ind. Dep't of Corr.*, 397 F.3d 587 (7th Cir. 2005) (affirming the district court's dismissal against DOC because it was not a person subject to suit under § 1983).

Thus as a matter of law, Strominger is limited to bringing his Eighth Amendment claims for money damages against the named officers in their individual capacities.

Defendants Earl Brock, Danny Ranard, Matthew Leohr, Danny Brough, Scott McGavic, Jerry Snyder, and Steve King seek summary judgment in their favor as to the § 1983 claims alleged against them. The defendants argue that they did not deny Strominger any necessities of life nor were they indifferent to his health or safety.

## C. Strominger's Claims

Strominger's claims remaining for resolution are based on three events. [6] The circumstances surrounding these events are discussed below.

### 1. Transfer to Cell M-301

First, Strominger complains of his transfer on August 18, 2008, from a larger cell, M-307, with three handicap supportive features – a grab bar, a higher toilet, and a wall-mounted sink – to a smaller cell that lacked these features, M-301. Strominger remained in this smaller cell for eight days until August 26, 2008, when he was transferred to a segregation cell in the facility's Custody and Control Unit ("CCU"). Strominger alleges that his placement in M-301 violated his federally secured rights.

With respect to Strominger's claim that his Eighth Amendment rights were violated as a result of his placement in a non-handicap accessible cell for a period of eight days, Strominger argues that it was obvious that removing him from his handicap accessible cell where he has always been housed to M-301, which lacked assessable features, would expose him to a substantial

---

6 The defendants correctly note that after screening and various rulings, this Court limited the claims to those against seven individual defendants: Earl Brock, Daniel Brough, Matthew Leohr, Scott McGavic, Danny Ranard, Jerry Snyder, and Steve King, and the Indiana Department of Correction, which was added as a defendant in 2012. See Entry of July 16, 2010 (dkt. 5); Entry of Dec. 7, 2010 (dkt. 45); Entry of Aug. 2, 2012 (dkt. 122). The Court also identified three separate events each of which forms the basis of Strominger's ADA and Eighth Amendment violations. See Entry of July 16, 2010; Entry of Dec. 7, 2010.

risk of harm. Surreply, dkt. 198 at 4. But as set forth above, to state a claim for relief under the Eighth Amendment, the alleged conduct must result in the denial of the minimal civilized measure of life's necessities. The deprivations experienced by Strominger associated with placement in cell M-301 were not sufficiently serious to state a violation of the Eighth Amendment. Strominger does not allege that he was deprived of the ability to wash or use the toilet, only that his use of the toilet and sink was made more difficult by the size of cell, the lack of grab bars and the fact that he could not pull his wheelchair under the sink. Strominger acknowledges that he could enter the cell as far as his bunk and that that he could move about the cell.

Strominger argues that because he was placed in this cell without grab bars he fell and was injured while trying to stand to use the toilet. There is no dispute, however, that Strominger could safely transfer from his wheelchair to his bed and to his toilet using his arms. Given the lack of grab bars and Strominger's disability it is hard to imagine why a reasonable person would not sit when using the toilet. In fact, Strominger agrees that he was "trying to stand to use the toilet, which I shouldn't have tried, and that's when I lost my balance." There is no evidence that any of the defendants could have or should have anticipated that this accident would occur.[7] Strominger was able at all times to independently and safely access the toilet in the seated position.

Further, there is no evidence that any of the defendants were aware of and disregarded an excessive risk to Strominger's health and safety while he was placed in M-301 for eight days during which time Strominger's disciplinary proceeding was pending. *See Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006) (questioning whether amputee's disability constituted objectively serious medical need requiring accommodation with grab bars or benches or crutch, where inmate could walk with a prosthesis and use toilets and showers without assistance); *see*

---

7 In addition, whether that injury was properly treated is not at issue in this case. That claim was raised in *Strominger v. Talens,* case number 2:10-cv-326-WTL-DML (judgment entered January 20, 2011).

*also Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (concluding that jailers did not violate arrestee's right to due process by detaining him unattended for two nights in cell that, although designed to accommodate his wheelchair, was equipped with toilet and sink he struggled to use without assistance and bed he could not reach). Strominger was only in M-301 for a few days, and those individuals involved in his care knew that as a result of a weapon being found in his possession, Strominger would soon be transferred out of M-301.

At most the individual defendants' actions in placing Strominger in cell M-301 and not transferring him to a cell that better accommodated his disability for eight days were negligent. *Washington v. LaPorte County Sheriff's Dept.*, 306 F. 3d at 515, 518 (stating that "ordinary negligence by prison officials is not enough to show an Eighth Amendment violation"); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir.1996) ("Mere negligence or even gross negligence does not constitute deliberate indifference."). Strominger has shown no more than an inability to use the cell's toilet from a standing up position and general inconvenience. The record shows that the prison complied with constitutional standards at the most basic level, and Strominger does not provide any evidence from which a reasonable jury could conclude that an excessive risk to his health and safety existed during this eight day period. Accordingly, the individual defendants are entitled to summary judgment in their favor on this Eighth Amendment claim.

Next, Strominger alleges that his short-term placement in M-301 violated his federally secured rights under the ADA and the Rehabilitation Act because cell M-301 was not in compliance with certain construction guidelines. Strominger misunderstands what is required by the construction guidelines. The ADA and Rehabilitation Act do not entitle Strominger to any particular accommodation. If the DOC could show that Strominger was housed in a cell that was in conformance with the ADA Accessibility Guidelines the DOC would be in compliance with the

ADA and at would be the end of the inquiry. See 28 C.F.R. § 35.151 (effective January 26, 1992).

However, the converse is not true. The fact that the M-301 was not in conformance with ADA

accessibility guidelines does not necessarily make the DOC liable to Strominger for compensatory

damages under the ADA or Rehabilitation Act. Instead, the issue is whether M-301 was readily

accessible to Strominger because the DOC can comply with the ADA and Rehabilitation Act

through other methods that clearly allow equivalent access to the facility. The record reflects that

Strominger did have access to all areas of his cell by transferring from one area to the next with his

hands. There is no evidence that Strominger was denied meaningful access to any program or

activity as a result of his temporary placement in M-301. There is no evidence of any activities of

daily living that Strominger needed to do in M-301 which he was unable to complete.

Strominger also argues that the DOC violated his rights when it failed to consider

alternative housing arrangements to accommodate him. Even if other accommodations could have

been made, the record reflects that during Strominger's incarceration he has been continuously

housed in a handicap accessible cell with the exception of his eight-day placement in M-301 while

his disciplinary action for possession a weapon was resolved. The failure to continuously house

Strominger in a handicap accessible cell was unfortunate. However, there is no evidence that this

temporary placement was a result of anything more than negligence. Under these circumstances

the DOC is entitled to summary judgment on the ADA and Rehabilitation Act claims and

Strominger is not entitled to compensatory damages against the DOC.

### 2.      Shower Access in CCU

Strominger alleges that the defendants violated his federally protected rights when he was

denied access to a shower with a wall mounted bench seat for thirty-four days from August 30,

2008 to October 3, 2008. During that time, the shower used by offenders in wheelchairs in the

CCU had a plastic chair and a grab bar. See dkt. no. 175-16 at ¶ 11. Strominger alleges that his Eighth Amendment rights were violated because the defendants did not provide him with "basic personal hygiene," and that his ADA rights were violated because the defendants did not provide him with the "required handicap accessible shower." The defendants argue that they are entitled to summary judgment because the undisputed evidence shows that Strominger was placed into a cell and provided with shower access that the DOC and its employees reasonably believed accommodated his needs.

When Strominger arrived in the CCU, a wall mounted shower bench was not available. Instead, Strominger was provided with a shower with grab bars and a plastic chair. Other inmates as heavy or large as Strominger previously used the plastic chair while taking a shower, and, until Strominger arrived, none of the inmates had complained. After successfully showering with the plastic chair, Strominger determined that the chair was not safe and made his concerns known. The record reflects that DOC staff, on learning of Strominger's concerns, responded appropriately. Matt Leohr corresponded with J.D. Horst, the facility's safety hazard manager, to find out whether the CCU was in compliance with the ADA. He also did some research and identified a PVC-pipe shower chair that he thought might meet Strominger's needs, and he sent Horst another e-mail suggesting that the CCU buy the chair. These actions resulted in the facility buying a portable bath chair that could support Strominger's weight and address his concerns about slippage. The chair was sent to the CCU but apparently never used because about a week before, Lt. Brough had also met with Strominger to hear his concerns. And after the meeting, he noticed that a staff shower had the very sort of wall-mounted bench seat that Strominger had requested and arranged for it to be installed. A wall-mounted bench seat was reinstalled in the CCU shower sometime in late September or the first week of October.

Once again Strominger's Eighth Amendment claim fails because the conditions of which he complains were not sufficiently serious. Strominger states that "weekly minimum of showers is necessary to prevent serious adverse effects on the physical and mental health and safety of inmates in segregation." Surreply, Dkt. 198 at 5 (citing *Davenport v. DeRoberti,* 844 F.2d 1310, 1316-1317 (7th Cir. 1988) (holding one shower a week for inmates in segregation unit is constitutionally sufficient)). But this is not a case in which Strominger was denied a shower. In fact, there is no dispute that Strominger had access to a shower with a grab bar and a plastic chair. There is also no dispute that he was able to stand if he had something to hold on to. Strominger even admitted that he was able to shower in the CCU using the plastic chair that was provided to him. He says that he "almost fell," but no harm actually resulted. Moreover, even if his concerns about his safety in transferring from his wheelchair to the chair provided were justified, he did not seek any assistance before determining that he would not shower. Assistance getting into and out of the chair would have been provided to Strominger if he had requested such assistance. Strominger simply decided that he would not shower unless he was provided with a wall mounted shower seat. In addition, strictly speaking, Strominger was not deprived of sanitation insofar as he always had access to his cell sink (which he does not deny accommodated his disability), and could hand bathe himself, using the soap and towels provided by DOC. Strominger himself acknowledges that during the periods when he was declining to shower in the belief that the absence of a wall-mounted seat made showering unsafe, he was able to take "bird baths." There is no evidence that any individual defendant was deliberately indifferent to Strominger's need to shower and maintain his personal hygiene. Accordingly, the individual defendants are entitled to summary judgment on this Eighth Amendment claim.

Although the ADA and Rehabilitation Act claims are not as clear cut, Strominger's

assertion that he was deprived of a safe environment because he was not provided with facilities meeting the ADA construction standards is misplaced. As previously stated, the failure to provide a specific accommodation does not necessarily entitle Strominger to compensatory damages under the ADA or the Rehabilitation Act. The defendants, however, do not assert that the plastic chair alone was a reasonable and adequate accommodation for Strominger's disability under the ADA or the Rehabiliation Act, nor could they. Any reasonable person with limited mobility and nerve damage to their legs would be hesitant to transfer to a garden variety plastic chair. In addition, a reasonable jury could conclude that the DOC was negligent when, over the course of ten years, it failed to replace the CCU's only wall mounted bench seat that had been destroyed by another inmate. But that is not the end of the inquiry.

In addition to the chair, the shower also had a grab bar and DOC staff would have provided physical assistance to Strominger in the shower if he had requested such assistance. These accommodations reflect that the DOC was not intentionally discriminating against Strominger based on his disability and that it was making reasonable efforts to accommodate him until a wall mounted shower seat was installed. However, Strominger did not request any assistance; instead he made a unilateral decision not to shower in the CCU until a wall-mounted bench seat was installed. It was Strominger's choice to refrain from taking a shower during the thirty-four days it took to locate and install a wall mounted shower seat. The facility's response may not have been as swift as Strominger liked but any delay based on the record in this case is at most negligence.

### 3. Shower Access in SCU

Strominger alleges that his protected rights were also violated when he went without a shower from October 8, 2009, to February 18, 2010, following his transfer to the Secure Confinement Unit ("SCU"), after he inflicted fatal injuries on another inmate. Shortly after

Strominger arrived at the SCU, a special bath chair designed for overweight persons was provided for his use. See dkt. no. 175-2 (illustrative photograph of portable shower chair). However, a wall-mounted bench seat was not installed until February 17, 2008. See dkt. no. 175-4 (illustrative photograph of wall-mounted shower chair).

Strominger's claim that he was deprived of a shower while he was in the SCU borders on frivolous. The shower chair provided to Strominger on October 9, 2009, one day after his arrival in the SCU was designed to hold his weight and not slip. The record reflects that Strominger simply determined that he had a right to a wall-mounted shower seat and that it was therefore unsafe to shower until one was installed. Strominger's unilateral decision not to shower simply because the seat did not comply with certain ADA construction guidelines does not state an Eighth Amendment claim.

In addition, the DOC, through its employees, swiftly and appropriately responded Strominger's needs. Even after the shower chair was provided, McGavic continued to investigate to make sure that the chair would meet Strominger's needs. He called Milburn Pharmacy, whom he believed had supplied the shower chair and received a facsimile of the chair's specifications which noted that the chair had suction feet to prevent it from slipping and was designed to support a person weighing up to 500 pounds. He also met with Strominger personally after receiving a letter from him on October 26, 2011.

Meanwhile, the DOC did not ignore Strominger's continued refusal to take a shower. Lt. Steven King, who was then the zone supervisor of the SCU, noticed from his review of the shower records that Strominger was not showering, and on at least two or more occasions between October 6, 2009 through February 20, 2010, met with Strominger. King informed Strominger that the chair could support his weight, was appropriate for use in a shower, and would meet

Strominger's needs. However, King also discussed the adequacy of the chair with the safety manager.

Unit team manager Jerry Snyder responded similarly, meeting with the unit team manager and then meeting with Strominger to let him know what he had found out. Moreover, after Correctional Officer Andy Porter, who was the facility's ADA Coordinator, determined that the ADA guidelines required the facility to install a wall-mounted bench seat, Physical Plant Manager Roger Dagley acted swiftly to get the seat ordered and installed. In short, DOC acted promptly and appropriately to Strominger's request for an accommodation. The evidence shows a complete lack of deliberate indifference or discriminatory intent regarding the shower accommodations provided in the SCU. Under these circumstances, Strominger is not entitled to relief under the Eighth Amendment, the ADA, or the Rehabilitation Act.

### Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton*, 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983).

Strominger is not entitled to money damages based on his eight day placement in cell M-301 or the denial of a wall mounted shower. There is no evidence from which a reasonable jury could conclude that any of the defendants intentionally or with deliberate indifference failed to provide meaningful access or reasonable accommodations to Strominger or that the conditions of

Strominger's confinement violated the Eighth Amendment. Accordingly, the defendants are entitled to judgment as a matter of law.

The motion for summary judgment [dkt. 172] is therefore **granted**. Judgment consistent with this Order shall issue.

**IT IS SO ORDERED.**

Date: ___01/23/2014___

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

RAYMOND STROMINGER
Reg. No. 160814-B701
WABASH VALLEY CORRECTIONAL FACILITY
Electronic Service Participant-Court Only

All Electronically Registered Counsel